GEORGE D. HEATON AND WIFE, EMILY W. HEATON; JULES A. BUXBAUM AND WIFE, RENEE N. BUXBAUM; WILLIAM C. BEAN AND WIFE, DELORES B. BEAN; JOHN COLE HATCHER AND WIFE, ANNE S. HATCHER; JOHN F. BOS AND WIFE, BEVERLY G. BOS; CHARLES F. MOCK AND WIFE, ELIZABETH MOCK v. THE CITY OF CHARLOTTE, A MUNICIPAL CORPORATION; THE ERVIN COMPANY, A CORPORATION; CRESCENT LAND AND TIMBER CORPORATION, A CORPORATION; AND W. H. JAMISON, SUPERINTENDENT OF BUILDING INSPECTION FOR THE CITY OF CHARLOTTE

No. 68

(Filed 20 January 1971)

1. **Municipal Corporations § 30— power to zone**

    A municipality has no inherent power to zone its territory and possesses only such power to zone as is delegated to it by the enabling statutes, G.S. 160-172 *et seq.*

2. **Municipal Corporations § 30— power to zone — statutory and constitutional limitations**

    The authority to enact zoning ordinances is subject to the limitations imposed by the enabling statute and the Constitution forbidding arbitrary and unduly discriminatory interference with property rights.

3. **Municipal Corporations § 30— zoning ordinance — adoption in accordance with enabling statutes**

    A zoning ordinance or an amendment thereto which is not adopted in accordance with the enabling statutes is invalid and ineffective.

4. **Municipal Corporations § 30— zoning ordinance — presumption of validity**

    A municipal zoning ordinance is presumed to be valid, and the burden is on the complaining party to show it to be invalid.

5. **Municipal Corporations § 30— zoning amendment — notice and public hearing**

    There must be compliance with the statutory requirements of notice and public hearing in order to adopt or amend a zoning ordinance.

6. **Municipal Corporations § 30— adoption of zoning ordinance with alteration of proposal advertised and heard — when additional hearing and notice is required**

    Ordinarily, in order to adopt a zoning ordinance or amendment containing alterations substantially different (amounting to a new

Heaton v. City of Charlotte

proposal) from those advertised and publicly heard, there must be additional notice and opportunity for additional hearing; however, no further notice or hearing is required after a properly advertised and properly conducted public hearing when the alteration of the initial proposal is insubstantial or when the initial notice is broad enough to indicate the possibility of substantial changes and the substantial changes made are of the same fundamental character as those contained in the notice and result from objections, debate and discussion at the initial public hearing.

7. **Municipal Corporations § 30— substantial alteration of zoning proposal —changes favorable to complainants**

Alteration of the initial zoning proposal will not be deemed substantial when it results in changes favorable to the complaining parties.

8. **Municipal Corporations § 30— amendment to zoning ordinance — alterations of original proposal made after public hearing — necessary for additional notice and hearing**

No additional notice or public hearing was required for the adoption of an amendment to a municipal zoning ordinance containing alterations of the original proposal made after a public hearing on the proposal had been held where (1) the public notice of the hearing was broad enough to give notice of substantial changes in the area in question, (2) all parties were given an opportunity to be heard at a public hearing, (3) the changes made in the proposed amendment did not alter the fundamental character of the proposal heard and discussed at the public hearing, (4) the alterations incorporated in the ordinance as finally adopted were proposed by the planning commission and the city council as a result of the public hearing, and (5) the alterations, which decreased the area designated for a shopping center and increased the area for apartments, were favorable to the complaining parties.

9. **Municipal Corporations § 30— request for rezoning — authority of city council to rezone to requested classification or "higher classification" — ambiguity**

Provision of a municipal zoning ordinance giving the city council authority to change the existing classification of an area covered by a petition for rezoning "to the classification requested or to a higher classification or classifications without the necessity of withdrawal or modification of the petition," *held* not unconstitutionally vague and ambiguous in failing to state whether the changed classification must be higher than the requested classification, since the ordinance refers to action to be taken upon a requested change and the phrase "or to a higher classification" obviously refers to the "classification requested."

10. **Municipal Corporations § 30— rezoning to higher classification than that requested — omission of adopted classification from code section ranking classifications**

City council's alteration of a portion of the area involved in a petition for rezoning from the requested classification of B-1SCD to R-20MF was to a "higher classification" than that requested in the petition, notwithstanding R-20MF was inadvertently omitted from the

section of the zoning code which ranked zoning districts from the highest classification (most restrictive) to the lowest classification (least restrictive), another section of the zoning code having set forth the uses allowed and restrictions imposed under the R-20MR classification, and it being obvious that the R-20MF is less restrictive and thus a higher classification than B-1SCD.

11. **Statutes § 5— legislative intent**

The heart of a statute is the intention of the law-making body, and an act will not be invalidated when the meaning can be gathered from the full context of the statute and other statutes related to the subject.

12. **Municipal Corporations § 30— zoning amendment — necessity for three-fourths vote — G.S. 160-176 — rezoned property and buffer zone owned by same party**

In determining whether a favorable vote of three-fourths of the city council is required by G.S. 160-176 for the adoption of a zoning amendment, it makes no difference that petitioners own both the property to be rezoned and a buffer strip between such property and property owned by the persons who have protested the rezoning.

13. **Municipal Corporations § 30— G.S. 160-176 — meaning of "immediately adjacent" and "extending one hundred feet therefrom"**

As used in G.S. 160-176, the words "immediately adjacent" mean "adjoining" or "abutting," and the words "extending one hundred feet therefrom" refer to the distance to be measured from the zoned property in establishing the ownership of the "area of lots" referred to in the statute.

14. **Municipal Corporations § 30— conflict between zoning ordinance and enabling act**

In case of a conflict between a municipal zoning ordinance and the enabling act, the enabling act controls.

15. **Municipal Corporations § 30— zoning ordinance amendment — necessity for favorable vote by three-fourths of city council — buffer zone between rezoned property and protestants' property**

In order for plaintiffs to invoke the provisions of G.S. 160-176 requiring a favorable vote of three-fourths of the city council to adopt a zoning amendment, they must own 20% or more of the area extending 100 feet from the property sought to be rezoned; consequently, where defendants left a 100-foot buffer zone surrounding the property which they sought to have rezoned, the property of plaintiffs was not "immediately adjacent" to the rezoned property and a three-fourths vote of the city council was not required.

16. **Municipal Corporations § 30— creation of buffer zone to avoid three-fourths vote**

Even if a buffer zone was created for the sole purpose of avoiding the three-fourths vote required by G.S. 160-176, such action would be valid and effective to avoid such a vote.

Justice MOORE did not participate in the consideration or decision of this case.

APPEAL by plaintiffs Jules A. Buxbaum and wife, Renee N. Buxbaum; William C. Bean and wife, Delores B. Bean; John Cole Hatcher and wife, Anne S. Hatcher; John F. Bos and wife, Beverly G. Bos; and Charles M. Mock and wife, Elizabeth Mock, from *Martin, J.*, August 31, 1970 Schedule A Session of MECK-LENBURG Superior Court.

Defendants, The Ervin Company (Ervin) and Crescent Land and Timber Corporation (Crescent) are the owners of a 111.786 acre tract of land (tract) in Sharon Township, Mecklenburg County, lying outside the city limits of the City of Charlotte but lying within the City's zoning perimeter. The tract is bounded on the west by Providence Road, on the north by Sardis Lane, on the south by McAlpine Creek, and on the east by several of the plaintiffs' properties. Plaintiffs, with the exception of two persons, adjoin the tract. The tract owned by defendants was included in a comprehensive zoning ordinance adopted in 1962 which zoned 66 acres adjoining Providence Road, Sardis Lane and McAlpine Creek as R-15MF and zoned 45.126 acres of the tract adjoining McAlpine Creek, Sardis Lane, and the property of several of the plaintiffs in this action as R-15. The classification R-15 restricts the use of land to single family residences and permits construction of approximately 2.9 units per acre, and requires 15,000 square feet of development area per dwelling unit on a lot 80 feet wide with a side yard of at least 10 feet; the classification R-15MF permits single family houses, duplexes and multi-family buildings and developments. Charlotte Code § 23-4. Multi-family units in a R-15MF district must have a minimum lot size of 15,000 square feet for the first building plus 3,500 square feet for each additional building, with at least 65% of the area being open and unobstructed. Other classifications pertinent to this decision are the classification R-20MF and B-1SCD. The only uses permitted in R-20MF districts are one-family semi-detached, one-family attached, two-family and multi-family dwellings. The lot must have an area of at least 20,000 square feet for the first unit and 5,000 square feet for each additional unit, with at least 70% of the area being unobstructed.

The B-1SCD classification permits an integrated shopping center and requires a minimum site area of 3 acres per building,

requires a separation of 25 feet between buildings when the building is under 40 feet in height, requires separation of buildings by 35 feet when the building is between 40 and 60 feet in height. For buildings over 60 feet, the separated distance shall be 35 feet plus 1 foot for every 2 feet of building height above 60 feet.

On 13 May 1970 defendants Ervin and Crescent filed a petition requesting that 42.6 acres of the eastern portion of the tract be rezoned. The notice of hearing was properly published, and in pertinent part provided:

"NOTICE is hereby given that public hearings will be held by the City Council, and the Charlotte-Meckenburg Planning Commission, the Council Chamber, Second Floor of the Charlotte City Hall, on Monday, the 15th day of June, 1970, at 2 o'clock P. M., on the following petitions proposing changes on the official zoning map of the City of Charlotte, N. C. and Perimeter Area:

* * * * *

"PETITION No. 70-88. Change from R-15 to R-20MF (28.3 acres) and from R-15 and R-15MF to B-1SCD (14.3 acres) property south of Sardis Lane and east of Providence Road adjacent to Providence Square. Petitioners: The Ervin Company and Crescent Land and Timber Co.

* * * * *

"The City Council may change the existing zoning classification of the entire area covered by each petition, or any part or parts of such area, to the classification requested, or to a higher classification or classifications without the necessity of withdrawal or modification of the petition.

"Parties in interest and citizens shall have an opportunity to be heard and may obtain further information on the proposed changes from the Charlotte-Mecklenburg Planning Commission Office, Equity Building, 701 East Trade Street.

"Anyone desiring to file a written petition of protest intended to invoke the ¾ majority vote rule as specified in G.S. 160-176 must file such petition in the Office of the

City Clerk not later than the close of business on June 10, 1970.

"City Clerk,
Ruth Armstrong"

A protest petition was filed within the time required by G.S. 160-176 by owners of 20% in area of the property adjoining the east side of the tract.

The Agreed Statement of Case on Appeal contains the following:

"10. The relationship of the boundary of the 111.786 acre tract to the boundary of the area for which zoning reclassification was requested is shown by Sheet 2 of Exhibit A to this Agreed Statement of Case on Appeal and on the east side consists of a strip which is uniformly one hundred feet in width and denominated 'Buffer.' "

The buffer zone skirted the area proposed to be rezoned so that at no point was the property of any of the plaintiffs within 100 feet of the area proposed to be rezoned. This buffer area was not contained in the area requested for rezoning and remained zoned as classification R-15.

On 15 June 1970 a joint public hearing was held before the Charlotte-Mecklenburg Planning Commission and the Charlotte City Council. At the hearing Ervin and Crescent presented their plans for development of the area proposed for rezoning. The development plan, in brief summary, proposed a shopping center containing a food store, drug store, florist shop, and other miscellaneous specialty shops. The shopping center was to be located near the center of the rezoned tract and not on a major thoroughfare. The proposal called for a lake, common grounds with apartment buildings so placed that they did not face on through streets. The buffer strip was projected as a landscaped area with only walkways traversing it. The protestants contended that the proposed rezoning would aggravate the already congested traffic and road conditions, would lower property values in the area, and would in general be detrimental to the public safety, health, morals and welfare of those located in nearby areas.

After the public hearing, the Charlotte-Mecklenburg Planning Commission requested Ervin and Crescent to submit a

revised site plan reducing the B-1SCD area to 10 acres and increasing the R-20MF area to 31 acres. Applicants complied, and the Planning Commission thereupon recommended approval of the revised plan to the Charlotte City Council. After receiving the recommendation, several members of the Charlotte City Council made it known to Ervin that they thought 10 acres was still too large an area to be rezoned B-1SCD, and requested another revision of the site plan reducing B-1SCD area to 7.4 acres, with 1.4 acres of that total being dedicated to development of a lake and greenway. Applicants thereupon reduced the B-1SCD areas as requested and increased R-20MF area to 32.9 acres.

On 13 July 1970, at a regular meeting, held without additional notice or further public hearing, the Charlotte City Council, by vote of five to two, adopted Zoning Ordinance No. 692-Z, which approved classification of 7.4 acres to B-1SCD and 32.9 acres to R-20MF according to the last revised site plan. In so doing, the City Council ruled that the filed protest petition did not comply with provisions of G.S. 160-176 requiring three-fourths vote because the 100-foot buffer strip prevented the property owners who filed the petition from being "owners of twenty per cent or more . . . of the area of the lots . . . immediately adjacent either in the rear thereof or on either side thereof, extending one hundred feet therefrom."

Plaintiffs thereupon instituted this action seeking to have the ordinance declared void, and at the same time obtained a temporary restraining order preventing use of the property in question other than for uses permitted prior to the adoption of Ordinance No. 692-Z on 13 July 1970. Defendants Ervin and Crescent filed and served motion for summary judgment. The motion was heard by Judge Harry C. Martin on 31 August 1970, and on 3 September 1970 Judge Martin entered summary judgment of dismissal.

All plaintiffs except George D. Heaton and wife, Emily W. Heaton, appealed from the judgment entered. The case is now before the Supreme Court pursuant to its general referral order effective 1 August 1970.

*Paul B. Guthery, Jr., and Ray W. Bradley for plaintiff appellants.*

*Ervin, Horack & McCartha, by William E. Underwood, Jr., for The Ervin Company.*

*William I. Ward, Jr., for Crescent Land and Timber Corporation.*

*Henry W. Underhill, Jr., for City of Charlotte and W. H. Jamison.*

BRANCH, Justice.

Appellants first contend that the amendment to the zoning ordinance is invalid because it was altered after the initial hearing without additional notice or further hearing.

The notice of and the proceedings at the initial hearing are not challenged.

[1-4]  A municipality has no inherent power to zone its territory and possesses only such power to zone as is delegated to it by the enabling statutes, G.S. 160-172, *et seq.* The authority to enact zoning ordinances is subject to the limitations imposed by the enabling statute and by the Constitution. These limitations forbid arbitrary and unduly discriminatory interference with property rights in the exercise of such power. *Zopfi v. City of Wilmington,* 273 N.C. 430, 160 S.E. 2d 325. Thus, a zoning ordinance or an amendment thereto which is not adopted in accordance with the enabling statutes is invalid and ineffective. *Kass v. Hedgpeth,* 226 N.C. 405, 38 S.E. 2d 164; *Eldridge v. Mangum,* 216 N.C. 532, 5 S.E. 2d 721. However, a municipal zoning ordinance will be presumed to be valid, and the burden is on the complaining party to show it to be valid. *Zopfi v. City of Wilmington, supra; Helms v. City of Charlotte,* 255 N.C. 647, 122 S.E. 2d 817.

G.S. 160-175 provides:

"Method of procedure.—The legislative body of such municipality shall provide for the manner in which such regulations and restrictions and the boundaries of such districts shall be determined, established, and enforced, and from time to time amended, supplemented or changed. However, no such regulation, restriction or boundary shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an oppor-

tunity to be heard. A notice of such public hearing shall be given once a week for two successive calendar weeks in a newspaper published in such municipality, or, if there be no newspaper published in the municipality, by posting such notice at four public places in the municipality, said notice to be published the first time or posted not less than fifteen days prior to the date fixed for said hearing."

According to our research, the precise question here presented has not been decided by this Court. We therefore turn to other jurisdictions for enlightenment.

In *Klaw v. Pau-Mar Construction Co.*, 50 Del. 487, 135 A 2d 123, the Delaware Supreme Court interpreted an enabling statute substantially like our own G.S. 160-175. The Delaware statute, 22. Del. C. § 304, states:

"The legislative body of the municipality shall provide for the manner in which the regulations and restrictions and the boundaries of the districts shall be determined, established, and enforced, and from time to time amended, supplemented, or changed. However, no such regulations, restrictions, or boundary shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard. At least fifteen days notice of the time and place of such hearing shall be published in an official paper or a paper of general circulation in such municipality."

A public hearing concerning apartment house zoning was held after notice according to the Delaware statute, and the ordinance was finally enacted with two changes which were made after the public hearing, without further hearing or notice. The principal change consisted of reducing the areas in which apartments could be placed and permitted 40% of a lot to be occupied by buildings rather than 30% as originally proposed. In holding that there had been compliance with the notice provisions of the enabling act, the Delaware Court, in part, stated:

" . . . The only absolute requirement with respect to the notice to be given contained in § 304 is of 'the time and place of such hearing.' There is no provision in the section specifically requiring advance notice in detail of what the proposed regulations will accomplish.

"We think the sole requirement of 22 Del. C. § 304 is what is specifically set forth, viz, that it is proposed to amend the zoning ordinance in certain general aspects, and that at a certain time and place a public hearing will be held so that interested persons may appear and be heard either in support of or in opposition to the proposal. We have read the published notice of the hearing in this case and are of the opinion that it complies with the law.

\* \* \* \* \*

"The increase of the bulk requirement from 30% to 40% is not a change of such magnitude as to require the whole matter being commenced again. As a matter of fact, the requirement of the enabling law, that a hearing be held at which citizens may protest, implicitly contemplates that changes might be made in the original proposal as a result of such hearings. This, we think, is what actually happened and this, we think, is what the law contemplates shall happen. Our opinion in this respect is supported by authorities from other jurisdictions. *Cf. Town of Burlington v. Dunn*, 318 Mass. 216, 61 N.E. 2d 243, 168 A.L.R. 1181; *Walker v. Board of County Com'rs*, 208 Md. 72, 116 A. 2d 393; *Ciaffone v. Community Shopping Corp.*, 195 Va. 41, 77 S.E. 2d 817, 39 A.L.R. 2d 757; *City of Corpus Christi v. Jones*, Tex. Civ. App., 144 S.W. 2d 388.

In *Neuger v. Zoning Board*, 145 Conn. 625, 145 A. 2d 738, the plaintiffs attacked an amendment to a zoning ordinance on the ground that the adopted amendment differed radically from the originally noticed proposal. They contended that there was no legal hearing according to the City's charter, which required a public hearing on amendments to zoning regulations after notice published in an official paper stating time, place and purpose of the hearing. The notice published set forth that the amendments proposed would define a shopping center and would make possible the location of a liquor store in every such center. The definition of a shopping center included the requirement that it must be on land under single ownership. After a public hearing, the zoning board eliminated from the definition of a shopping center the requirement of single ownership and added a requirement that only one liquor store could be opened in each center. The changes resulted from objections voiced at the public hearing. The Connecticut Court, finding compliance

with the provisions for public hearing and notice, in part, stated:

" . . . To be adequate, the notice is required to fairly and sufficiently apprise those who may be affected of the nature and character of the action proposed, to make possible intelligent preparation for participation in the hearing. . . . The very purpose of the hearing was to afford an opportunity to interested parties to make known their views and to enable the board to be guided by them. It is implicit in such a procedure that changes in the original proposal may ensue as a result of the views expressed at the hearing. (Citations omitted) Notice of a hearing is not required to contain an accurate forecast of the precise action which will be taken upon the subject matter referred to in the notice."

The Virginia Supreme Court of Appeals considered the notice provision of a zoning enabling statute similar to our own statute in the case of *Ciaffone v. Community Shopping Corp.*, 195 Va. 41, 77 S.E. 2d 817. We quote the pertinent portion of that decision:

"The defendant's initial contention is that the C-1 area on the map included in the notice of public hearing differs from the C-1 area on the maps included as a part of the amended ordinance. Code Section 15-859 provides that ' . . . no such regulation, restriction or boundary shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard . . . . ' This statutory provision means only that parties in interest and citizens must be apprised of the proposed changes to be acted upon so they can be present to state their views. It does not require that the notice contain an accurate forecast of the precise action which the county board will take upon the subjects mentioned in the notice of hearing."

In *Kalvaitis v. Village of Port Chester*, 235 N.Y. Supp. 2d 44, the changes effected in amendment to a zoning ordinance between initial notice and final enactment consisted of the elimination of certain lots to be rezoned, an increase in the maximum square footage per dwelling, an increase in the maximum permissible height of buildings, an increase in required open space, and an increase in the required distances between buildings.

The Court, overruling surrounding landlords' objections as to lack of notice, stated:

> "Logic appears to dictate that if the only person adversely affected by change does not object, others whose rights are not infringed by the change may not do so. (Cites)"

Similarly, the notice procedures were upheld in *Naylor v. Salt Lake City Corporation,* 17 Utah 2d 300, 410 P. 2d 764, where the notice prior to the public hearing stated that the area in question was subject to be rezoned for "commercial" purposes, but the area was rezoned "business" without further notice or hearing. There the court reasoned that the objecting adjacent landowners had no ground to complain about notice because the originally proposed commercial zone, of which protestants had notice, was less restrictive than the business zone which was finally enacted.

In the case of *Aquino v. Tobriner,* 298 F. 2d 674, the court upheld a summary judgment against the landowner where the evidence showed that the change originally proposed in the notice imposed no requirements respecting the floor area or limitation of lot occupancy on the landowner's land, but the rezoning ordinance as finally passed contained such requirements. The court stated that the very purpose of a zoning hearing is to explore such subjects, and added that, even assuming that the limitations represented substantial changes in the original proposal, the plaintiff did not claim that the changes as adopted were not fully discussed and aired at the public hearing.

In the case of *Hewitt v. Baltimore County,* 220 Md. 48, 151 A. 2d 144, the pertinent provisions of the statute required that the county commissioners publish notice of the "place and time of the beginning of such hearing or hearings." The notice as published advised that there would be a hearing at a specified time and place to hear "objections and recommendation with respect to the final report" on the proposed zoning involving several square miles. The notice referred to a map on file which designated the area in question as residential, and the owners appeared at the hearing and requested that the property be classified for non-residential use. The county commissioners allowed this request, and the adjoining property owners attacked the zoning plan on the ground that notice of the hearing before

the commissioners had not been sufficiently worded as to give them notice of substantial changes. In holding there had been sufficient notice, the court said that the commissioners could hardly know without prejudgment or prophecy what action they might take at the hearing, and that under the circumstances the notice given could not have been more explicit or informative than it was. The court added that the plaintiffs had no right to assume that the county commissioners, the body entrusted with the sole power to enact zoning ordinances, was bound to adopt the preliminary proposals or recommendations submitted to it by the zoning commissioner.

[5-7]   Thus, the general rule as applied to Chapter 160, Article 14, is that there must be compliance with the statutory require-ments of notice and public hearing in order to adopt or amend zoning ordinances. Ordinarily, if the ordinance or amendment as finally adopted contains alterations substantially different (amounting to a new proposal) from those originally advertised and heard, there must be additional notice and opportunity for additional hearing. However, no further notice or hearing is required after a properly advertised and properly conducted public hearing when the alteration of the initial proposal is insubstantial. Alteration of the initial proposal will not be deemed substantial when it results in changes favorable to the complaining parties. Moreover, additional notice and public hear-ing ordinarily will not be required when the initial notice is broad enough to indicate the possibility of substantial change and substantial changes are made of the same fundamental character as contained in the notice, such changes resulting from objec-tions, debate and discussion at the properly noticed initial hear-ing.

[8]   In instant case the notice was broad enough to give notice of substantial changes in the area in question. A public hearing was held and all parties were given ample opportunity to be heard. The record shows that the changes made did not alter the fundamental character of the proposal heard and dis-cussed at the properly noticed initial hearing. Minutes of the City Council indicate that alterations incorporated in the ordi-nance as finally adopted were proposed by the Planning Commis-sion and the City Council as a result of expressions made at the public hearing, and were such that additional public hearing could have resulted only in repetitive statements by the same

parties or parties similarly situated. The ordinance as adopted decreased the area designated for a shopping center by 48% and increased the area for location of apartments by 16%. This action seems to be favorable to the complaining parties. The very purpose of the public hearing was to guide the City Council in making changes in the original proposal consistent with the views reflected at the public hearing. This is exactly what was done.

[9] In connection with this assignment of error appellants contend that the following portion of Section 23-96(a) of the Zoning Code of the City of Charlotte is unconstitutionally vague and ambiguous:

> " . . . The City Council may change the existing zoning classification of the area covered by the petition, or any part or parts thereof, to the classification requested or to a higher classification or classifications without the necessity of withdrawal or modification of the petition; provided, however, notices of hearings on such amendments shall inform the public that such action may be taken."

The ambiguity charged is that the section does not clearly state whether the changed classification would be higher than the requested classification or higher than the existing classification.

> "(A) particular zoning enactment or provision thereof may be judicially declared to be inoperative and void for uncertainty, vagueness or indefiniteness. However, the basis of the principle that courts will not, in doubtful cases, pronounce a legislative act to be contrary to the constitution applies with equal force where the courts are called upon to declare a statute to be so meaningless and unintelligible as to be inoperative . . . . " 58 Am. Jur., Zoning, § 24 pp. 954-955.

This section of the ordinance refers to action to be taken upon a requested change, so the phrase "or to a higher classification or classifications" refers to "the classification requested." Recognizing that every presumption is in favor of the validity of a legislative act, we do not find this section of the Charlotte Zoning Code to be so uncertain, vague or indefinite as to require

us to declare it void. *Lowery v. School Trustees*, 140 N.C. 33, 52 S.E. 267.

[10]   Section 23-96 (d) of the Charlotte-Mecklenburg Zoning Code ranks zoning districts from the highest classification (most restrictive) to the lowest classification (least restrictive). This section ranks the classification R-15 as higher than R-15MF, which, in turn, is ranked higher than the classification B-1SCD. The classification R-20MF is not ranked in this section, and appellants contend that consequently R-20MF is not a zoning classification, or, in the alternative, that it is not a "higher" classification than the zoning classifications requested by petitioners.

An examination of the Charlotte-Mecklenburg Zoning Code leaves no doubt that it was the intent of the legislative body to classify property by use and to denominate the more restrictive uses as the higher use. Section 23-36.1 of the Zoning Code fully sets out the uses allowed and restrictions imposed under the classification R-20MF. Even the untrained eye can see that the classification R-20MF is less restrictive and thus a lower classification than R-15, and is more restrictive and thus a higher classification than B-1SCD.

[11]   The heart of a statute is the intention of the law-making body, and the act will not be invalidated when the meaning can be gathered from the full context of the statute and other statutes related to the subject. *Trust Co. v. Hood, Com'r.*, 206 N.C. 268, 173 S.E. 601.

It is apparent from the legislative history that the omission of R-20MF from the ranking of zoning classifications was inadvertent. We cannot perceive how plaintiffs could have been misled in their preparation for hearings or in any manner prejudiced by this inadvertent omission in the Zoning Code.

[8]   We hold that no additional notice or public hearing was required before adoption of Zoning Ordinance 692-Z on 13 July 1970 by the Charlotte City Council.

Appellants next contend that the amendment to the zoning ordinance was invalid because it was not adopted by a favorable vote of three-fourths of all the members of the City Council.

G.S. 160-176 provides:

"Changes; Annexed Territory.—Such regulations, restrictions and boundaries may from time to time be

amended, supplemented, changed, modified or repealed. In case, however, of a protest against such change signed by the owners of twenty per cent or more either of the area of the lots included in such proposed change, or of those immediately adjacent thereto either in the rear thereof or on either side thereof, extending one hundred feet therefrom, or of those directly opposite thereto extending one hundred feet from the street frontage of such opposite lots, such amendment shall not become effective except by favorable vote of three-fourths of all the members of the legislative body of such municipality. The provisions of the previous section relative to public hearings and official notice shall apply equally to all changes or amendments."

Section 23-96 of the Zoning Code of the City of Charlotte incorporates the provisions of G.S. 160-176.

We accept the proposition that the amendment would be invalid if twenty per cent of the owners of the property within the area designated by the statute protested, and the ordinance did not receive a favorable vote of three-fourths of all the members of the City Council. Appellants contend that they qualified as protestants under G.S. 160-176 because their properties lie, in relation to the property proposed to be rezoned, "immediately adjacent thereto . . . extending one hundred feet therefrom."

In the case of *Penny v. Durham* 249 N.C. 596, 107 S.E. 2d 72, an owner of lots petitioned for reclassification of his property from residential zone to commercial zone for a shopping center. The City adopted an ordinance rezoning the property lying more than 150 feet from the street (Club Boulevard), thereby leaving unchanged a strip of property 150 feet wide between the zoned property and Club Boulevard. The owners of more than twenty per cent of the area of lots abutting on the opposite side of Club Boulevard from applicant's property protested the change. The protestants contended that the ordinance was invalid because it was not passed by a favorable vote of three-fourths of the members of the City Council, as required by G.S. 160-176. The protestants were not within the zoned area, and in order for them to file a valid protest their property must have come within the provisions of the statute which provided that it be "signed by owners of twenty per cent of the area of the lots . . . directly opposite thereto, extending one hundred feet from the street frontage of such opposite lots. . . . "

This Court, holding the ordinance valid and ruling that petitioner's property did not come within the provisions of G.S. 160-176, stated:

"The fact that Northland owns both the 'buffer strip' and the rezoned area and that both are parts of one tract of land makes no difference in this case. We must consider the matter in the same manner as if those areas were under separate ownership. The 'Zoning Regulations' provide that the City may divide the municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this article.' G.S. 160-173. To hold that zoning district lines must coincide with property lines, regardless of area involved, would be to render the act largely ineffective.

*  *  *  *  *

"So it is our opinion that the expression 'directly opposite' when applied to the lands in this case means those tracts of land on opposite sides of the street with only the street intervening. This seems to be the most natural and logical and best understood application of the expression. With reference to zoning 'the law is disposed to interpret language in the light of surrounding circumstances and to give to words their ordinary meaning and significance.' *In re Builders Supply Co.*, 202 N.C. 496, 163 S.E. 462.

*  *  *  *  *

"It must be kept in mind that 'Zoning ordinances are in derogation of the right of private property, and where exemptions appear in favor of the property owner, they must be liberally construed in favor of such owner.' "

After decision in *Penny*, G.S. 160-176 was amended by the 1959 General Assembly by Ch. 434, s. 1, and inserted the words 'thereto either' immediately after the word 'adjacent' and by inserting the phrase 'or on either side thereof' after the word 'thereto' in the second sentence. The obvious intent of the legislature is clearly stated in Section 2 of the amendatory act as follows:

"It is the purpose and intent of this act to extend the protest provision of G.S. 160-176 to the owners of twenty per cent or more of each of the areas of the lots on either side of and extending one hundred feet from any area in-

cluded in proposed changes or amendments of municipal zoning ordinances."

[12]   Subsequent to the passage of this amendment, this Court by its decision in *Armstrong v. McInnis,* 264 N.C. 616, 142 S.E. 2d 670, (1965) approved the creation of a buffer zone 101 feet in width around the outer edge of a tract zoned commercial, thereby separating the commercial zone from a residential zone. The buffer zone was created by allowing the 101 feet zone to remain zoned as residential. Therefore we conclude that the reasoning followed in *Penny* still prevails, and the fact that petitioners own both the property to be rezoned and the buffer strip will not affect decision in this case.

[13]   Appellants urge that the words "immediately adjacent" as used in the statute should be interpreted to mean "next in relation to the property to be zoned," and that it was not the intention of the legislature that "immediately adjacent" as used in the statute should refer to lots abutting or adjoining the property under consideration. They also contend that the words "extending one hundred feet therefrom" as used in the statute refer only to the depth required for lots of protesting owners.

Appellees contend that the words "immediately adjacent" as used in the statute mean "adjoining" or "abutting," and that the words "extending one hundred feet therefrom" refer to the distance to be measured from the zoned property in establishing the ownership of the "area of lots."

We find the following definitions in Webster's Third New International Dictionary:

Adjacent:        Not distant or far off; nearby but not touch- ing; relatively near and having nothing of the same kind intervening; having a com- mon border.

Immediately:    In direct connection or relation; closely (con- tiguous).

Immediate:       Existing without intervening space or sub- stance.

The courts of other jurisdictions have interpreted the phrase "immediately adjacent" in the context of statutes similar to G.S. 160-176.

In the case of *Parsons v. Wethersfield,* 135 Conn. 24, 60 A. 2d 771, owners of property zoned residential sought to have it rezoned for light industrial use. Subsequent to the original zoning as residential, a heavily traveled highway had been constructed along its east side and its western boundary was a 66-foot strip occupied by a railroad. Owners of property beyond the railroad protested the proposed rezoning, relying on a statutory provision which, in part, provided.

"If a protest shall be filed with the zoning authority against such change, signed by the owners of twenty per cent or more of the area of the lots included in such proposed change, *or of those immediately adjacent in the rear thereof extending one hundred feet therefrom,* . . . such change shall not become effective except by unanimous vote of the zoning authority if such zoning authority is a zoning commission. . . . " (Emphasis ours)

Decision of the principal assignment of error in *Parsons* turned on the meaning of the words "immediately adjacent." The Court, holding the ordinance valid, stated:

"The intent of the General Assembly in passing an act is to be determined in the first instance by the words it has used. *State v. Bello,* 133 Conn. 600, 604, 53 A. 2d 381. Its general purpose must also be considered. *Biz v. Liquor Control Commission,* 133 Conn. 556, 559, 53 A. 2d 655. The purpose of § 132e as far as the case at bar is concerned is to define the protesting interest deemed sufficient to require unanimous action by the commission. The pertinent words are 'twenty per cent or more of the lots . . . immediately adjacent.' To say that the term 'lots . . . immediately adjacent' is to be defined as lots in the immediate vicinity or neighborhood, as claimed by the plaintiffs, would furnish no definite standard on which to figure the percentage. If, on the other hand, it is construed as meaning 'adjoining or abutting,' the test can be easily applied. The latter is a common definition. *Tudor v. Chicago & S. S. R. T. Co.,* Ill., 27 N.E. 915, 917; Id. 154 Ill. 129, 39 N.E. 136; *City of Lawrenceburg v. Maryland Casualty Co.,* 16 Tenn. App. 238, 242, 64 S.W. 2d 69; *Long v. London & Lancashire Indemnity Co.,* 6 Cir., 119 F. 2d 628, 630; *Pickens v. Maryland Casualty Co.,* 141 Neb. 105, 108, 2 N.W. 2d 593. The property of the

plaintiffs was not immediately adjacent to the land in question and a unanimous vote of the commission was not required."

The case of *Putney v. Abington Township, Pa.,* 176 Pa. Super. 463, 108 A. 2d 134, is one in which the court construed a statute requiring a three-fourths favorable vote of the Board of Township Commissioners when there was a protest of twenty per cent or more of the owners of lots within the area proposed to be zoned or those "immediately adjacent" extending 100 feet from the lots rezoned. There, the Court held that the words "immediately adjacent" meant "touching the area rezoned."

The term "immediately adjacent" has been defined by the courts in other cases factually different from instant case. The Wisconsin Supreme Court, in the case of *Superior Steel Products Corporation v. Zbytoniewski,* 270 Wis. 245, 70 N.W. 2d 671, construed a statute requiring motor vehicles to display rear lights when parked upon or in use upon places "immediately adjacent" to the traveled portion of a highway. There the Court stated that the qualifying word "immediately" gave the phrase "immediately adjacent" the meaning of "adjoining or with no space intervening." For other cases so defining the term "immediately adjacent," see *Pickens v. Maryland Casualty Co.,* 141 Neb. 105, 2 N.W. 2d 593; *Long v. Indemnity Co.,* 119 F. 2d 628; *City of Lawrenceburg v. Maryland Casualty Co.,* 16 Tenn. App. 238, 64 S.W. 2d 69.

We must adopt the sense which promotes the policies and objects of the legislature in enacting the statute. *Nance v. Railroad,* 149 N.C. 366, 63 S.E. 116.

The Supreme Court of Errors of Connecticut in *Park Regional Corp. v. Town Plan. & Zoning Comm.,* 144 Conn. 677, 136 A. 2d 785, interpreted a zoning statute which required a unanimous vote of the zoning commission if protest was filed by owners of twenty per cent or more of the area of lots immediately adjacent in the rear of land included in a proposed zoning change and extending one hundred feet therefrom. There the Court said:

" . . . The only rational explanation of the language used is that the General Assembly was not thinking of owners of lots but of owners of areas. What is required is a

protest filed by the owners (whether one owner or many owners) of at least 20 per cent of certain areas. It is not the owners of 20 per cent of the lots with whom we are concerned but the owners of 20 per cent of certain areas of lots. An entire lot, as in the case of the Valente lot here, might not be either 'immediately adjacent' to or 'in the rear' of the lots included in the change of zone. But if part of it was, then that part would constitute an area 'immediately adjacent in the rear' of the lots included in the zone change."

[13]   In instant case we cannot agree with appellants that the legislature intended to make the width or depth of lots owned by those seeking to protest one of the standards by which their eligibility to protest would be measured. Such standard would have no reasonable relation to the impact of the zoning ordinance. Conversely, the impact of the zoning ordinance would be greatly diminished by the distance that the area owned by protestants lies from the property proposed for zoning. Certainly the owners of lots immediately outside of (within 100 feet) or adjoining the boundary line of the property to be altered, are the parties most directly affected by the alteration and, therefore, most logically are the "owners of . . . the area of the lots" intended by the legislature to qualify as protestants.

[13]   When we give the words "immediately adjacent" their ordinary meaning and significance as applied to the facts of this case, and liberally construe the ordinance in favor of the owner of the property to be zoned, we conclude that the expression means "adjoining" or "abutting." This interpretation creates an area easily determinable which lends itself to definite calculations of the percentage required to invoke the provisions of the statute.

[14]   We also note appellants' argument that the definition of the word "lot" in section 23-96, subsection A, of the Zoning Code of the City of Charlotte precludes the proposed buffer zone from becoming operative. We do not find this argument persuasive. Even had it been so, the enactment of the section by the City would be subject to the limitations of the enabling act, *Zopfi v. Wilmington, supra,* and in case of conflict the municipal ordinance would yield to the general law regulating the same matter. *Eldridge v. Mangum, supra.* Nor do we perceive that the context of the statute (G.S. 160-176) indicates that the word "lot" has

any meaning other than its common and ordinary meaning. *Greensboro v. Smith,* 241 N.C. 363, 85 S.E. 2d 292.

[15] We therefore hold that in order for plaintiffs to invoke the provisions of G.S. 160-176 they must own twenty per cent or more of the area extending 100 feet from the rezoned tract. Plaintiffs do not own lots in such area because of the 100 foot buffer zone.

[16] Finally, appellants contend that the buffer zone is a subterfuge and therefore it does not avoid the right of affected property owners by petition to require the more stringent vote by the City Council in adopting the zoning amendment.

The Law of Zoning and Planning, Rathkopf, Vol. 1, Chap. 28, Section 28-10, contains the following statement:

" . . . (W)here an applicant for a zoning change seeks to avoid the necessity of a larger than majority vote by creating a buffer zone of 100 feet between that portion of his property sought to be rezoned and the lands of adjacent property owners, such action is valid and avoids the requirement of such larger vote."

In Radnor, Ithan & St. Davids Civic Assn. Appeal, 5 D. & C. 2d 156, 41 De. Co. 396 (Pa. Quar. Sess. 1954), a zoning ordinance was adopted by a simple majority and the zoning code of the township of Radnor contained a section providing that three-fourths of the township commissioners must vote for adoption of the amendment when twenty per cent of the property owners whose property is within one hundred feet of the property to be rezoned file a protest. The property owner filed an amended petition creating a 100-foot buffer zone between his property and the property of protestants. The protestants contended that the creation of the buffer zone was a subterfuge and ineffective to prevent the more stringent vote. Holding that only a majority vote was required, the Court stated:

"The question of law therefore here presented is whether or not such action, admittedly done for the purpose of avoiding the three-fourths vote made necessary by section 1704 and section 3105, *supra,* is legally effective for that purpose. We are of the opinion that it is.

"A well founded principle of law since time immemorial has been that one may avoid the impact of a particular

statute but may not evade such impact: 43 Am. Jur. § 10. If the changes are actual and not merely simulated, although made for the purpose of avoiding the statute, they do not constitute illegal evasion.

"Webster defines the word 'evade' as meaning 'to take refuge in evasion,' 'to use artifice in avoidance' and defines the word 'avoid' to mean 'to keep away from,' 'to keep clear,' etc., and 'avoidance' is said to be 'the act of avoiding or keeping clear of,' so that in the English language itself there is a clear distinction between 'avoidance' and 'evasion,' the former being an acceptable means and the latter an unacceptable means.

"This theory was the subject of discussion by the late Mr. Justice Holmes, of the United States Supreme Court in *Bullen v. State of Wisconsin,* 240 U.S. 625, 630, 631, wherein he said: 'We do not speak of evasion, because, when the law draws a line, a case is on one side of it or the other, and if on the safe side is none the worse legally that a party has availed himself to the full of what the law permits. When an act is condemned as an evasion what is meant is that it is on the wrong side of the line indicated by the policy if not by the mere letter of the law . . . '; and again, this great jurist said in the case of *Superior Oil Company v. State of Mississippi,* 280 U.S. 390, 395, 396: 'The fact that it (vendor) desired to evade the law, as it is called, is immaterial, because the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it.' "

We see no evidence of evasion in this record. The buffer zone had been proposed before the initial hearing, and it was discussed then. The record leaves the impression that the Charlotte-Mecklenburg Planning Board and the Charlotte City Council recognized their responsibility to meet the demands of growth in the area which they governed and at the same time acted responsively to the objections voiced by the protestants when the ordinance was considered and adopted. The purpose of the "buffer zone" was to lessen the impact between the existing residential area and the newly zoned area. Further, applying the authority above cited, even had the zone been created for the sole purpose of avoiding the three-fourths vote required by G.S. 160-176, the zoning ordinance would not have

Heaton v. City of Charlotte

been invalidated, since the creation of the buffer zone was in full compliance with the law as enacted by the General Assembly.

The rezoning ordinance No. 692-A adopted by the Charlotte City Council on 13 July 1970 was regularly adopted and is legal and valid.

Affirmed.

Justice MOORE did not participate in the consideration or decision of this case.